**Slip Op. 23-133**

# UNITED STATES
# COURT OF INTERNATIONAL TRADE

### Court No. 21-00527

HABAŞ SINAI VE TIBBI GAZLAR
ISTIHSAL ENDÜSTRISI A.Ş.,

*Plaintiff,*

v.

UNITED STATES,

*Defendant,*

and

CLEVELAND-CLIFFS INC.;
STEEL DYNAMICS, INC.; and
SSAB ENTERPRISES LLC,

*Defendant-Intervenors.*

Before: M. Miller Baker, Judge

## OPINION

[The court denies Plaintiff's motion for judgment on the agency record and instead grants judgment to Defendant and Defendant-Intervenors.]

Dated: September 14, 2023

*Matthew M. Nolan* and *Jessica R. DiPietro*, ArentFox Schiff LLP of Washington, DC, on the briefs for Plaintiff.

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; *Tara K. Hogan*, Assistant Director; and *Kelly A. Krystyniak*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, on the brief for Defendant. Of counsel on the brief was *Paul K. Keith*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

*Stephen P. Vaughn* and *Daniel L. Schneiderman*, King & Spalding, LLP, of Washington, DC, on the brief for Defendant-Intervenor Cleveland-Cliffs, Inc.

*Roger B. Schagrin* and *Jeffrey D. Gerrish*, Schagrin Associates of Washington, DC, on the brief for Defendant-Intervenors Steel Dynamics, Inc., and SSAB Enterprises, LLC.

*Baker*, Judge: In this case, a Turkish manufacturer and distributor challenges the Department of Commerce's calculation of its home-market sales in an administrative review of an antidumping order applicable to steel imports from that country. For the reasons below, the court sustains Commerce's determination.

## I

To combat unfair trade practices, the Tariff Act of 1930, as amended, permits Commerce to impose antidumping duties on an importer of "foreign merchandise [that] is being, or is likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673(1). This requires the Department to conduct "a fair comparison . . . between the export price or constructed

export price and normal value" of the subject merchandise. *Id.* § 1677b(a). The statute defines "normal value" as "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country . . . ." *Id.* § 1677b(a)(1)(B)(i); *see also Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1334 n.6 (CIT 2020) (discussing normal value). This case concerns the calculation of normal value.

## II

In 2016, the Department issued an antidumping order covering hot-rolled steel flat products from Turkey. *See Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom*, 81 Fed. Reg. 67,962 (Dep't Commerce Oct. 3, 2016). In 2019, several domestic producers requested an administrative review of that order covering the period from October 1, 2018, through September 30, 2019. Appx001085–001088; *see Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 84 Fed. Reg. 52,068, 52,070 (Dep't Commerce Oct. 1, 2019). Commerce opened a review and selected Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi, a Turkish manufacturer and exporter of rebar, as the sole mandatory respondent. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 67,712, 67,716 (Dep't Commerce Dec. 11, 2019); *see also* Appx001096–001101.

Habaş duly answered the Department's various questionnaires. The company's Section A response provided audited financial statements in Turkish lira, *see* Appx001374–001461, and its Section B and C responses supplied home-market sales data in both U.S. dollars and lira, *see* Appx001631–001632. Habaş also submitted evidence that customers' orders were made and confirmed in dollars; the company contends that the same evidence shows that the customers paid in dollars as well. Appx001350–001360.

In its preliminary results, Commerce found that "Habaş reconciled its home-market sale values in Turkish lira . . . to its audited financial records," so the Department accordingly used "a home market unit price denominated in [lira]." Appx001024. Based on that price, the Department calculated a weighted-average dumping margin of 21.48 percent. Appx001049.

Habaş then argued that the preliminary results improperly measured its home-market sales in lira instead of dollars. Appx002213–002237. The company contended that Turkish law required it to use lira as the accounting currency, and that the Department has a "consistent line of precedents . . . in which Commerce has used U.S. dollar values for home-market sales, when the transactional elements (contracts, confirmations, and payments) were made in dollars between the respondent and its customer, even though the accounting registrations of the sales were in local currency." Appx002219. The domestic producers responded that "[t]he total USD value of Habaş' home market sales has not been reconciled to the financial statements, and thus Commerce may not rely on those

USD values in the antidumping calculations." Appx002247–002248 (emphasis and footnote references omitted).

The Department reiterated in its final results that it had to rely on lira "[b]ecause Habaş demonstrated that its [home-market] sales were reported accurately and completely in only the [lira]-denominated sales values, but not the claimed USD sales values." Appx001069. In response to Habaş's contention that the Department should base normal value on dollars because "Commerce's normal practice is to use the 'transaction currency,' " the agency explained that its protocol is to "use the sales value that can be reconciled to the company's audited financial statements." Appx001069 (quoting Habaş case brief at 2). Using those values based on lira, the agency calculated a final weighted-average dumping margin for the company of 24.32 percent. Appx001079.

## III

Habaş brought this suit under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and 1516a(a)(2)(B)(i) challenging Commerce's final determination. ECF 10, ¶ 3. The court has subject-matter jurisdiction over such actions under 28 U.S.C. § 1581(c).

Three domestic steel producers intervened as defendants supporting the government. *See* ECF 18 (Cleveland-Cliffs Inc.), ECF 24 (Steel Dynamics, Inc., and SSAB Enterprises LLC). Habaş moved for judgment on the agency record. ECF 44. The government, ECF 49, and the intervenors, ECF 43, opposed and

Habaş replied, ECF 45 (confidential); ECF 46 (public). The court decides the motion on the papers.

In actions such as this brought under 19 U.S.C. § 1516a(a)(2), "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). That is, the question is not whether the court would have reached the same decision on the same record—rather, it is whether the administrative record as a whole permits Commerce's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up).

In addition, Commerce's exercise of discretion in § 1516a(a)(2) cases is subject to the default standard of the Administrative Procedure Act, which authorizes a reviewing court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Solar World Americas, Inc. v. United States*, 962 F.3d 1351, 1359 n.2 (Fed. Cir. 2020) (explaining that in § 1516a cases

brought under section 516A of the Tariff Act of 1930, APA "section 706 review applies since no law provides otherwise") (citing 28 U.S.C. § 2640(b)). "[I]t is well-established that an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *See SKF USA Inc. v. United States*, 293 F.3d 1369, 1382 (Fed. Cir. 2001) (cleaned up).

## IV

Habaş challenges Commerce's decision to rely on the lira values of its home-market sales rather than the reported dollar values. ECF 44, at 2–3. The company asserts two theories. First, it argues that the Department's determination is arbitrary and unreasonable given its history of preferring the transaction currency. *Id.* at 9–23. Second, the company claims that the valuation of its home-market sales in lira creates a mischaracterization of the sale price that distorts the margin. *Id.* at 23–30.

## A

Habaş argues that Commerce unlawfully departed from its "longstanding practice . . . to use the currency of a respondent's sale prices based on the currency which controls the ultimate amount a purchaser pays for the sale." ECF 44, at 13.[1] The company contends

---

[1] Although its factual determinations receive deference, *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996), Commerce, like all agencies, must treat like situations consistently. *See SunEdison, Inc. v. United States*, 179 F. Supp. 3d 1309, 1316 (CIT 2016) ("[A]n agency

that in previous antidumping reviews, the Department stated that its preference is to use the transaction currency to avoid unnecessary currency conversions. *Id.* at 13–14 (citing *Stainless Steel Plate in Coils from the Republic of Korea*, 66 Fed. Reg. 45,279, 45,280 (Dep't Commerce Aug. 28, 2001); *Certain Hot-Rolled Steel Flat Products from the Republic of Turkey*, 84 Fed. Reg. 30,694 (Dep't Commerce June 27, 2019), and accompanying I&D Memo at 10 (2016–17 HRS I&D Memo)). For example, when calculating the home-market sales of Colakoglu, another Turkish distributor of steel products, Commerce stated that it would measure the sales in dollars where "(1) the price for these transactions [was] fixed in USD at the time of invoicing (*i.e.*, at the date of sale); and (2) this USD price control[led] the ultimate amount that the purchaser pa[id] for the sale." 2016–17 HRS I&D Memo at 10.

Habaş argues that its home-market sales satisfy these criteria because they were "negotiated, confirmed, and paid in U.S. Dollars." ECF 44, at 15. The company points to e-mail communications with a customer and an invoice for a sample sale in which the ultimate price was negotiated in dollars. Appx001351–001353. Additionally, a bank statement shows that the

determination that is arbitrary is *ipso facto* unreasonable, and a determination is arbitrary when it . . . treats similar situations in dissimilar ways."); *see also Brit. Steel PLC v. United States*, 127 F.3d 1471, 1475 (Fed. Cir. 1997) ("An agency is obligated to follow precedent, and if it chooses to change, it must explain why.") (quoting *M.M.&P. Mar. Advancement, Training, Educ. & Safety Program v. Dep't of Com.*, 729 F.2d 748, 755 (Fed. Cir. 1984)).

company received a payment in dollars from the same customer.[2] Appx001360. Habaş insists that this information alone demonstrates that its home-market sales were transacted in dollars and therefore obligated Commerce to use the USD price in its calculations.

The Department, however, would have acted inconsistently with its precedent only if Habaş's home-market sales were negotiated in dollars *and* the dollar price ultimately controlled the amount paid. *See* 2016– 17 HRS I&D Memo at 10. Although the company provided evidence that the prices were negotiated, ordered, and set in dollars on the invoice date, Commerce concluded that Habaş did not show that those prices ultimately controlled the final payment. Appx001070–001071.

When determining which currency's value controlled the transaction, Commerce's practice is to look to "the sales value that can be reconciled to the company's audited financial statements." Appx001069; *see also Stainless Steel Flanges from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 13,244 (Dep't Commerce Mar. 28, 2018) and accompanying Preliminary I&D Memo at 9. Therefore, as in previous

---

[2] Commerce explained that this bank statement is of no use because "the payment amount apparently has no connection with the USD price and quantity shown on the invoice (*i.e.*, the payment amount does not equal USD price times quantity, or to [sic] USD price times quantity plus tax)." Appx001070. The Department therefore concluded that the price shown on the document had no connection to the ultimate payment. *Id.*

investigations, the Department required Habaş to "provide a reconciliation of the sales reported in [its] home market sales databases to the total sales listed in [its] financial statements." Appx001139. The company correspondingly provided audited financial statements in lira, Appx001070, which the agency reconciled with Habaş's reported sales values, Appx001068. Commerce accordingly determined that the lira values controlled the transaction.

The company argues that if the Department could reconcile the lira invoice prices with audited financial records, the dollar prices necessarily reconcile because the lira amount is "directly related to and derived from the USD amount on the invoice." ECF 46, at 12. Commerce, however, explained that Habaş "does not know the payment date of each invoice." Appx001070. Accordingly, the Department could not determine what foreign exchange rate was in effect on the date of the actual payment. *Id.*[3] Because Commerce could not assign a value in dollars to each payment received, it could not reconcile each payment with the dollar value on the corresponding invoice.

These facts distinguish this review from Colakoglu's submission in the 2016–17 administrative review. There, the Department determined that prices

---

[3] As Habaş points out, the lira experienced "an aberrational and unique devaluation" during the period of review, causing the foreign exchange rates to fluctuate by as much as 17.6 percent month-to-month throughout 2018. ECF 44, at 28–29. A large range of exchange rates therefore could have applied on each payment date.

were negotiated and invoiced in dollars and "the buyer paid the [lira] equivalent amount of the USD price *at the time of payment*." 2016–17 HRS I&D Memo at 9 (emphasis added). Unlike Habaş, therefore, Colakoglu could definitively assign foreign exchange rates to specific payments because it knew each payment date, and Commerce could confirm that Colakoglu was "paid the [lira] amount based on the USD price set on the date of sale and the exchange rate in effect at the time of payment," so the "USD amount controlled the ultimate [lira] amount paid by the [home-market] customers." *Id.*

As the Department explained here, "the currency in which the sales are 'incurred' is not the sole determining factor." Appx001069. Substantial evidence supports Commerce's valuation of Habaş's home-market sales in lira, and the company did not show that the Department acted arbitrarily.

B

Habaş further asserts that "relying on the [lira-]denominated value, converted to U.S. Dollars, introduces an extraordinary distortion to the margin calculations." ECF 44, at 28. This claim derives from Commerce's established practice that disfavors converting prices "into the [home-market] currency at the date of the [home-market] sale and then back to USD at the date of the U.S. sale." 2016–17 HRS I&D Memo at 9; *see also* 19 U.S.C. § 1677b-1(a) (obligating the Department to "convert foreign currencies into United States dollars using the exchange rate in effect on the date of sale of the subject merchandise" instead of the rate in

effect on the date of the home-market sale). Converting a U.S. dollar price into lira at the date of the home-market sale and then back into dollars using a different exchange rate at the date of the U.S. sale would therefore distort the home-market price.

The Department, however, did not "convert[] the USD-denominated price from U.S. Dollars to Turkish Lira." ECF 44, at 29. It instead directly "relied on Habaş's reported [lira] values, which reconciled to Habaş's audited financial statements." ECF 49, at 26. Therefore, no unnecessary currency conversion occurred.

\*   \*   \*

For the foregoing reasons, the court denies Habaş's motion for judgment on the agency record and grants judgment on the agency record to the government and Defendant-Intervenors. *See* USCIT R. 56.2(b). A separate judgment will issue. *See* USCIT R. 58(a).

Dated: September 14, 2023          /s/ *M. Miller Baker*
       New York, NY              Judge